Filed 2/7/20

# CERTIFIED FOR PARTIAL PUBLICATION[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B232572 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA041397) |
| v. | |
| PETER JUAN CERDA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Hayden Zacky, Judge. Affirmed in part, reversed in part, and remanded with directions.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Peter Juan Cerda.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant Kyle Allin Johnson.

---

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are identified as those portions between double brackets, e.g., [[/]].

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pitney, Acting Senior Assistant Attorney General, William Shin and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Defendants and appellants Peter Juan Cerda and Kyle Allin Johnson were involved in shooting into two separate houses with an assault rifle. They appealed their convictions of one count of murder and twenty-three counts of attempted premeditated murder with gang and firearm enhancements. They raised claims of insufficiency of the evidence, instructional error, ineffective assistance of counsel, cumulative error, and sentencing error. In a nonpublished opinion filed on July 18, 2013, we affirmed the judgments but vacated Johnson's sentence and remanded for resentencing. (*People v. Cerda et al.* (Jul. 18, 2013, B235674) [nonpub. opn.].)

The matter was reviewed again, based on Cerda's motion to recall the remittitur. In a nonpublished opinion filed on January 23, 2015, we reversed Cerda's first degree murder conviction and remanded the matter to the trial court, allowing the district attorney to retry the murder charge or accept a reduction of Cerda's conviction to second degree murder.[1] (*People v. Cerda et al.* (January 23, 2015, B235674) [nonpub. opn.].)

While Cerda's and Johnson's appeals were pending, the Legislature enacted Senate Bill No. 1437 (SB 1437) (Stats. 2018, ch. 1015), which amended the laws related to malice and accomplice liability for murder. The Legislature also enacted

---

[1] Counsel for Cerda notes that the district attorney did not opt to retry him for first degree murder.

2

Senate Bill No. 620 (SB 620) (Stats. 2017, ch. 682), which gave trial courts discretion to strike or dismiss certain firearm enhancements.

Now, the matter has returned to us once again. The Supreme Court granted appellants' petition for review and has transferred the matter to us with directions to vacate our earlier decision and reconsider the cause in light of SB 1437, SB 620, and *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*), which limited the application of the kill zone theory for attempted murder.

In accordance with the Supreme Court's order, we vacate the January 23, 2015 nonpublished opinion. In the published portion of this opinion, we discuss why the evidence was sufficient to support the kill zone theory of liability.

In the nonpublished portion, we reject Cerda's and Johnson's other arguments that (1) SB 1437 should apply to attempted murder; (2) the natural and probable consequences doctrine should not apply to attempted premeditated murder; and (3) SB 1437 should apply retroactively without complying with its petition procedure. We vacate Cerda's and Johnson's sentences and remand for resentencing in light of SB 620. The trial court is also to afford Johnson an opportunity to make a record that complies with the requirements of *People v. Franklin* (2016) 63 Cal.4th 261, 283–284 (*Franklin*). The decision regarding Cerda's and Johnson's previously raised claims of error remains the same as in the prior opinion. We again reverse Cerda's first degree murder conviction because the trial court improperly permitted the jury to find that he was guilty under the natural and probable consequences doctrine. The judgments of conviction are otherwise affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

I.    Facts

    A. Prosecution Evidence

        1. Katrina Place shooting (counts 1–14)

On February 8, 2008, 14-year-old Robert E.[2] was at his house on Katrina Place in Palmdale. He was with his mother, Luz E., his sisters, Mayra E. and Christina E., and his brothers, including 12-year-old Francisco E. They were throwing a party at the house.

Later in the evening, Robert E. heard gunshots while he was in the garage with Ricardo R., one of his sister's friends. Robert E. heard something hit an area immediately next to him. Upon hearing the gunshots, he ducked and crawled into the house. He heard about ten shots rapidly fire. Ricardo R. heard about fifteen shots. The garage door was closed at the time.

Francisco E. was sitting at a dining room table with other family members and friends, including Gerardo Salazar, Mayra E., Stephanie R., Adriana R., Denise F., and Liz S. Windows to the dining room were located between the front door of the house and the garage. The dining room was on the first floor. Francisco E. heard more than ten gunshots fired. Mayra E. pushed him to the floor.

Adriana R. was in the dining room, sitting next to Salazar, who had accompanied her to the house. She heard about eighteen shots ricocheting off the walls. When she heard the

---

[2]    To protect the personal privacy interests of the victims, other than Gerardo Salazar who was killed, we will refer to each by first name and last initial. (Cal. Rules of Court, Rule 8.90, subd. (b)(4).)

4

shots, she threw Stephanie R. on the ground. Stephanie R. was 13 or 14-years-old at the time. Adriana R. was hit on the left eye by a foreign object, causing her to bleed. Glass hit the back of Mayra E.'s neck. She was sitting to the left of Salazar.

Once the shots ceased, Adriana R. crawled to the kitchen, then to the living room. Mayra E. crawled to the bathroom. Francisco E. also crawled to the bathroom. After twenty seconds, Francisco E. and Mayra E. returned to the dining room. Francisco E. saw holes in the wall and in the curtain. Salazar was bleeding, face-down on the floor. Salazar died from a gunshot to the head.

Luz E. and her husband, Sergio H., were in a bedroom when she heard about twenty gunshots. Christina E. was in another bedroom with her boyfriend, Daniel D. Four-year-old Aliza V. and 9-month-old Denise R. were in the master bedroom. Each of these bedrooms was on the second floor.

When the shots were fired, Daniel D. looked outside the window and saw a large pickup truck. He saw muzzle flashes from the pickup truck. The truck remained stationary when the shots were fired. Daniel D. saw the shooter in the back of the truck, leaning out and firing the gun. Daniel D. went outside to try to pursue the truck, but it was gone.

After the shooting, Luz E. saw bullet holes in the front of the house. Ricardo R. saw a hole in the garage door. Robert E. saw a hole in a television, located in the back of the garage, and one in a refrigerator.

2. Morning Circle shooting (counts 15–24)

About thirty minutes after the Katrina Place shooting, gunshots woke Vicente V., as he was asleep at his house on Morning Circle in Palmdale. Twelve persons lived there,

5

including members of his immediate family and his brother's family.

Vicente V.'s house had two floors. On the night of the shooting, he and his wife, Maria, were in their bedroom located immediately on top of the garage conversion. Their 13 and 7-year-old sons, Gerardo and Esteban, slept in a bedroom above their parents' bedroom. Their older son, Vince V., Jr., was sleeping downstairs. Their 15-year-old daughter, Cassandra, was sleeping in the family room. Their 16-year-old daughter, Patricia, was sleeping in another bedroom. Vicente V.'s brother, Victor, and his wife, Veronica, slept in the master bedroom with their 2-year-old daughter, Naomi, and 4-year-old son, Alexander. Vicente V.'s 11-year-old nephew, Victor, Jr., and 10-year-old niece, Veronica, were sleeping in a bedroom on the second floor, above the garage.

After the shooting, Vicente V. went outside and saw six damaged areas. Two holes were above his front door. Another hole was in a stone facade which was to the right of the front door. There were also holes above and through a large window which was above the front door. The side of the garage, near the front entry, sustained a hole or additional damage. There was also damage to a fence post. Bullets struck multiple areas of the interior, including a staircase leading to an upstairs bedroom and the master bedroom.

Vicente V. denied being a member of the Val Verde Park gang. But he stated that Vince V., Jr. was a member.

### 3. Forensic evidence

Robert Keil, a senior criminalist for the Los Angeles County Sheriff's Department, examined the house on Katrina Place after the shooting. Keil discovered sixteen bullet holes on the exterior

of the house, including one on the garage, one on the frame of the front door, and several around and through the dining room window. One bullet penetrated the garage door and a television inside of the garage before striking the back wall of the garage. Other bullets penetrated the exterior of the house and struck other areas inside, including the interior back wall of the dining room, a kitchen cabinet, and the entry to the kitchen. One bullet had blood, human tissue, and bone residue on it. This bullet went through the dining room window, penetrated Salazar's head, and struck the corner of the room.

Other bullets penetrated the exterior on the second story of the house, including the exterior wall and the tiled roof of the house. One of these bullets first penetrated two interior walls in an upstairs bedroom and a sliding door, before striking another wall. Walls by the upstairs staircase and other bedrooms were also struck. Other shots penetrated a bedroom wall and struck a hallway wall. Keil also found a bullet fragment in the master bathroom, which traveled across the upstairs hallway and through the master bedroom.

Sixteen spent casings were located on the street outside the Katrina Place house. The casings were for 7.62 by 39-millimeter rounds. Typically, an AK-style rifle uses this size of ammunition. Keil explained that an AK-style rifle is a semiautomatic assault rifle commonly used by military forces. The AK-47 is included in this series of assault rifle. The projectiles from these rifles travel at up to four times the velocity of a handgun, such as those using nine-millimeter ammunition. They have the potential for penetrating substantial barriers, including car doors and exterior walls of residences, as well as multiple additional walls. By

contrast, a nine-millimeter bullet would not have the power to penetrate an exterior wall.

Keil determined that by the way the casings were grouped together, eleven shots were fired from one area in front of the Katrina Place house, and five shots were fired from another area about fifteen feet away. The two groupings of casings were not consistent with shooting all sixteen shots in rapid succession. Ten bullet fragments were discovered in the house. Based on the caliber, rifling characteristics, and bullet type, these fragments were consistent with the casings found in the street.

Keil also examined four additional casings and four live rounds which were collected in front of the house on Morning Circle. He saw that they matched the casings from the Katrina Place shooting. They were the same caliber and made by the same manufacturers. Keil also determined the casings were all fired from the same rifle.

### 4. Statements of Pedro A.

The prosecutor called Pedro A. as a witness. Pedro A. was a member of the Evil Klan gang. His nickname was Flaco. Pedro A. was incarcerated in state prison for a gang-related attempted murder conviction. Pedro A. believed that he would be in protective custody or get killed if he assisted the district attorney's office or the police, or otherwise acted as a snitch.[3]

Before calling Pedro A. as a witness, the prosecutor and Los Angeles County Sheriff's Detective Donna Cheek spoke with him. However, during Pedro A.'s testimony, he claimed to not remember or denied making any statements to them. He also claimed to not remember or denied making any statements to Los

---

[3] Personal privacy interests support not identifying Pedro A. by his full name. (Cal. Rules of Court, rule 8.90, subd. (b)(10).)

Angeles County Sheriff's Detective Howard Cooper. Detective Cheek and Detective Cooper were the investigating officers for the Katrina Place and Morning Circle shootings.

Detective Cheek recounted the statements Pedro A. made before his testimony. During the conversation, she and the prosecutor reviewed Pedro A.'s 2008 statement to Detective Cooper. Detective Cooper's 2008 interview with Pedro A. was recorded and played for the juries.[4]

On February 10, 2008, Pedro A. was at a party at a house of a person named Jorge.[5] Pedro A. was with Cerda, Johnson, and their friend, Saul Trujillo.[6] Pedro A. left the party for a short time. When he returned, he learned that Cerda, Johnson, and Trujillo had gone to another party on Katrina Place. Cerda and Trujillo returned and told Pedro A. that 18th Street gang members had beaten up Johnson. When Johnson returned from the Katrina Place party, Pedro A. saw that his lip was bleeding, and he was upset. They made plans to retaliate against the persons who beat up Johnson. They left the party and Cerda obtained an AK-47 from his house. Pedro A. described the AK-47 as a long black rifle with a wooden stock. He confirmed the

---

[4] Cerda and Johnson were jointly tried, but each had his own jury.

[5] The reporter's transcripts refer to this person as "George." However, his name is spelled "Jorge" in the exhibits, including the transcript of the interview with Pedro A. For consistency with the prior opinions, we spell his name "Jorge."

[6] Pedro A. referred to Cerda, Johnson, and Trujillo by their nicknames, which were Snaps, Casper, and Dreamer, respectively.

magazine was a "banana clip."  Cerda, Johnson, and Trujillo got into a Ford F-150, driven by a person named Jose Casillas.[7] Cerda was in the front passenger seat.  Trujillo was behind him. Johnson was behind the driver.  They went to the party where Johnson was beaten up.  Pedro A. did not join them.  Several minutes later, he heard gunshots.

A couple of days after the shooting, Pedro A. spoke to Johnson and Cerda.  Johnson told him that they drove to the Katrina Place house.  They drove around the block once.  Johnson was lying down in the truck bed with the rifle.  When they stopped in front of the house again, Johnson sat up and fired into the house.  Johnson also told Pedro A. that Cerda shot up a house belonging to someone named Tank from the Val Verde Park gang which was "beefing" with their gang.

5.  Party at Jorge's house

Fifteen-year-old Erika V. and her sister, Yasmine, attended the party at Jorge's house.  The Katrina Place house was about a block from Jorge's house.  At about 11:00 p.m. to 12:00 a.m., Casillas drove Erika V. and Yasmine home in a dark green pickup truck.  She knew Casillas as "Puppet."  At the party, Johnson was introduced to Erika V. as "Casper."  As Erika V. was going home, she saw Johnson coming from the direction of the Katrina Place house.  He was staggering as if he was drunk.

6.  Cerda's jailhouse phone calls

Cerda made two phone calls while in jail.  Both were recorded and played for his jury.  The first call was to his

---

[7]     Jose Casillas was charged as a defendant in this case.  He was tried separately from Cerda and Johnson.  Pedro A. referred to him by his nickname, Puppet.

parents. His mother stated, "They said they were gonna let you go today." Cerda responded, "No, no, no. I'm not[,] mom. I'm gonna be here for a long time." Cerda then told his father, "Listen to me[,] they're not gonna release me." Cerda explained, "I'm gonna be in here because I was involved in a murder. My friend shot someone and killed 'em. And I shot at a house but I didn't kill nobody, but my friend shot and killed someone. I shot a house but I didn't kill nobody."

In the second call, Cerda spoke to a female named Vanessa and her father, admitting that he was involved in a murder.

### 7. Johnson's police interview

Detective Cooper, along with Los Angeles County Sheriff's Detective Mitch Robison, interviewed Johnson. The interview was recorded and played for Johnson's jury.

Johnson initially denied involvement in the shootings. Johnson explained that he was at a party and hit up a person and argued with him. Johnson was drunk. Cerda and Trujillo told him to calm down. They told Johnson that they would take care of it. He claimed to not know what Cerda and Trujillo were going to do. Johnson left the party.

Robison acknowledged that Johnson was scared. He encouraged Johnson to "man up." Cooper asked Johnson if he meant to kill somebody or only scare them. Johnson stated that he intended to only fight. Johnson's friends told him, "We're going to bust a mission." Johnson responded that he was not going. Johnson continued to deny that he went with them.

The detectives informed Johnson that his "homeboy" told them that he "busted up" the other house. Johnson stated that Cerda obtained a gun and asked him if he wanted to go. Cerda explained to Johnson that he should go with them because he

11

was joining the gang. Johnson admitted to accompanying them. They drove in a black Ford F-150. However, he stated that Cerda was in the bed of the truck and fired shots when they reached the house. He further stated that Cerda also shot at the other house.

Johnson continued to deny shooting at the first house. The detectives continued to tell Johnson that his "homeboys" said that he committed the shooting.

When Robison explained to Johnson the importance of telling the truth, he finally admitted to firing the gun. Johnson stated that he did not mean to do anything wrong because he was drunk. He admitted to shooting at the "18th Street" house. He also confirmed that Cerda shot at the "Val Verde" house. He further stated that he accompanied Cerda to get his gun. He saw Cerda load the gun. Johnson was instructed to start shooting when they stopped driving. Johnson was told that he would have to shoot because he was joining a gang. He admitted again to the shooting and confirmed that he fired approximately fifteen to sixteen times from the bed of the truck.

After Johnson shot at the first house, he switched places with Cerda, who went to the bed of the truck. Cerda then fired shots at the "Val Verde" house.

8. Gang evidence

Los Angeles County Sheriff's Detective Robert Gillis was assigned to investigate gangs in the Antelope Valley. In Palmdale in 2008, the Locos Marijuanos gang, or LMS, consisted of ten members. During that time, the primary activities of LMS included vandalism, vehicle theft, carrying firearms, and shooting. Gillis opined that in 2008, Johnson and Cerda were LMS gang members, based on their prior admissions to membership and associations with other members. Gillis also

spoke to Jose Casillas, who admitted his membership in the LMS gang.

In 2008, a rivalry existed between the LMS gang and a gang called Val Verde Park, or VVP. LMS was allied with another gang called Lancas. Vicente V. was a founding member of the Val Verde Park gang. His son, Vince V., Jr., was also a member. In 2008, Lancas members shot at Val Verde Park members around the corner from the home of Vicente V.

The 18th Street gang is one of the largest Latin gangs in Southern California. There were 18th Street gang members in the Antelope Valley. However, Gillis was not aware of any rivalries between the 18th Street gang and LMS.

Gillis discussed multiple facets of gang culture, including initiation into the gang, loyalty to the gang, and the importance of respect. Gang members were required to back up their fellow gang members.

Gillis discussed the significance of retaliation when a gang member is beaten up by rival gang members. In Gillis's experience, the beaten gang member would retaliate with greater violence. Failure to retaliate would negatively impact the reputations of the beaten gang member and his or her gang. The gang would appear weak and be subjected to more attacks by the rival gang.

The prosecutor asked Gillis to answer a hypothetical question derived from the evidence of the Katrina Place shooting. Gillis opined that the crime was committed for the benefit of the gang whose members committed the shooting. Gillis reasoned that the retaliatory shooting intimidated and created fear in the community. He explained the significance of using an AK-47 assault rifle. Its sole purpose was to kill. It was capable of

penetrating multiple walls.  Because of the high-powered capability of the AK-47, the shooting exceeded retaliations that would normally occur.  It was retaliation "with an exclamation point on it."

When the prosecutor asked a hypothetical question, which mirrored the shooting of the Morning Circle house, Gillis similarly opined that the crime benefited the gang.  He stated the second shooting would intimidate the community.  Persons in the community would hear that the perpetrators were willing to commit two shootings against two separate gangs.  The second shooting would also show that the gang members did not fear apprehension by law enforcement officers.  Gillis explained that they would have boldly committed the second shooting when the entire law enforcement agency would be nearby investigating the first shooting, which had occurred only a short time before.

Gillis stated that it was also common for multiple gang members to participate in drive-by shootings.  Each gang member would assume a role, consisting of the driver, the shooter, and lookouts who would alert the others to the presence of law enforcement officers.

Gillis discussed the influence of the Mexican Mafia over Latin street gangs in Southern California.  The Mexican Mafia prohibited gang members from shooting at children.  It also required gang members to get out of their cars and walk up to their victims before shooting to avoid injuring innocent persons, as could occur in a drive-by shooting.  Violating these rules could result in punishment by death from the shooter's own gang or a rival gang.  However, gang members did not always follow these rules.  Gillis also clarified that the trend has returned to drive-by shootings.

B. Defense Evidence

Johnson testified on his own behalf. He was 16 years old at the time of the shootings.

On the night of the incidents, Johnson went to two parties. Before arriving at the first party, Johnson used crystal methamphetamine. At the first party, he drank ten to fifteen beers and smoked marijuana. He went to the second party at Katrina Place with Pedro A. and Trujillo. Johnson drank one or two additional beers at the Katrina Place party, but he was already drunk.

At the Katrina Place party, Johnson asked several men, "Where you from?" Several persons surrounded Johnson and he saw punches coming from all directions. He was hit several times and knocked to the ground. He fled the party by jumping over a rear wall. He walked by himself to his house. He stayed at his house the rest of the night. He denied being present for any shooting.

Johnson denied telling Pedro A. that he had been in the bed of a truck. He did not know from whom Pedro A. heard this information.

Johnson claimed that after he was taken into custody, a detective named Robert Jones told him to "just let them know what they want to know" and he could go home.

Johnson next spoke with Detective Cooper and other detectives. He denied involvement in the shootings. He told Cooper that two others were involved in the shooting. Johnson stated that Cerda got in the bed of the truck and shot at the house. He also stated that Cerda and Trujillo got in the bed of the truck. Johnson told different stories because he was confused. He ultimately admitted to shooting. Johnson

15

recognized that the detectives did not believe him when he initially denied involvement. Accordingly, he believed that if he told the detectives what they wanted to hear, he could go home.

Johnson testified that he lied to Detective Cooper in three interviews about being in the truck when the shooting occurred. He also testified that he lied about telling Detective Cooper that he drank only two to four beers. Johnson recognized that telling the police that he shot up a house and killed somebody would affect his life.

Johnson admitted that he was previously a member of Locos Marjiuanos from 2007 to when he was arrested in 2008. He went by the moniker Casper. He also acknowledged that Trujillo was an LMS member named Dreamer. Johnson had known Cerda for about one year prior to the shootings. He testified that Cerda was not an LMS gang member. Johnson also disputed that LMS was in a rivalry with Val Verde Park.

Johnson confirmed that if a gang member gets beaten up by rival gang members, he should retaliate. If the beaten gang member fails to retaliate, his fellow gang members would beat him up. Failure to retaliate would bring shame to the gang. Johnson testified that although LMS was not in a war against 18th Street, his getting beaten up showed disrespect to him. He was expected to do something about it.

C. Rebuttal evidence

Both juries heard the recorded police interviews with Johnson that were initially played only for his jury.

II.  Procedure

Cerda's jury convicted him of first degree murder (Pen. Code, § 187, subd. (a); count 1).[8]  Johnson was convicted of second degree murder (§ 187, subd. (a); count 1).  The juries convicted both Cerda and Johnson of 13 counts of attempted premeditated murder for the Katrina Place incident (§§ 664, 187, subd. (a); counts 2–14) and 10 counts of attempted premeditated murder for the Morning Circle incident (§§ 664, 187, subd. (a); counts 15-24).  The gang enhancement was found true as to each count against both Cerda and Johnson.  (§ 186.22, subd. (b)(1)(C).)[9]

For counts 1 through 14, Cerda's jury found that a principal used and discharged a firearm, causing great bodily injury or death.  (§ 12022.53, subds. (b), (c), (e).)  For counts 15–24, Cerda's jury found that he personally used and discharged a firearm.  (§ 12022.53, subds. (b), (c).)

For counts 1 through 14, Johnson's jury did not find true the enhancements for personal use of a firearm, personal discharge of a firearm, or personal discharge of a firearm causing death or great bodily.  (§ 12022.53, subd. (b), (c), (d).)  For counts 15 through 24, Johnson's jury found that a principal used and discharged a firearm.  (§ 12022.53, subds. (b), (c), (e).)

---

[8]     All further undesignated statutory references are to the Penal Code.

[9]     Because murder and attempted premeditated murder are felonies "punishable in state prison for life," the gang penalty provision, under section 186.22, subdivision (b)(5), should have applied, instead of the gang enhancement under subdivision (b)(1)(C).  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1006–1007.)

17

On count 1, the trial court sentenced Cerda to 25 years to life, plus an additional 25 years to life for the firearm enhancement. On counts 2 through 14, the court imposed consecutive life terms with a minimum parole eligibility period of seven years, plus an additional 25 years to life for the firearm enhancement. The total sentence on counts 2 through 14 was 416 years to life. On counts 15 through 24, the trial court increased each of the minimum parole eligibility terms to 15 years pursuant to the gang penalty provision, plus an additional twenty years for the discharge of a firearm enhancement. The trial court also imposed the terms on counts 15 through 24 consecutively.[10] The total term on counts 15 through 24 was 350 years to life. Cerda's total sentence was 816 years to life.

The trial court sentenced Johnson to 15 years to life on count 1. On counts 2 through 14, the court imposed consecutive life terms, increasing the minimum parole eligibility term to 15 years, pursuant to the gang penalty provision. The total term on counts 1 through 14 was 210 years to life. On counts 15 through 24, the trial court sentenced Johnson to 200 years to life.[11] For the discharge of a firearm enhancements, the trial court imposed

---

[10] The court imposed and stayed the terms for the lesser firearm enhancements as to each count. (§ 12022.53, subd. (f).)

[11] On counts 15 through 24, the trial court also imposed and stayed the minimum parole eligibility term for the gang penalty provision. (§ 12022.53, subd. (e)(2); *People v. Brookfield* (2009) 47 Cal.4th 583, 595; *People v. Gonzalez* (2010) 180 Cal.App.4th 1420, 1427.) However, the trial court did not account for the minimum parole eligibility term for attempted premeditated murder, which is life with the possibility of parole after serving a term of at least seven years. (§§ 664, subd. (d), 3046, subd. (a)(1).)

an additional 20 years each to counts 15 through 24.[12]  Johnson's total sentence was 410 years to life.

DISCUSSION

**[[**I.   Cerda's first degree murder conviction under the natural and probable consequences doctrine

In our original opinion, we concluded there was sufficient evidence to sustain Cerda's conviction on the first degree premeditated murder count for the death of Gerardo Salazar. Subsequently, our Supreme Court held in *People v. Chiu* (2014) 59 Cal.4th 155, 158–159 (*Chiu*), that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine.  Rather, his or her liability for that crime must be based on direct aiding and abetting principles.  [Citation.]"  Under the natural and probable consequences doctrine, a person who aids and abets an intended target crime is also guilty of a nontarget crime committed by a perpetrator, if the nontarget crime was a reasonably foreseeable consequence of the intended target crime.  (*People v. Medina* (2009) 46 Cal.4th 913, 920; *People v. Prettyman* (1996) 14 Cal.4th 248, 271; *Chiu*, *supra*, 59 Cal.4th at p. 161.)  *Chiu* concluded that "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine."  (*Id.* at p. 166.)

---

[12]    On Counts 15 through 24, the trial court imposed the 20 year enhancements for discharge of a firearm and imposed and stayed the lesser firearm use enhancement.  (§ 12022.53, subd. (f).)

*Chiu* raised the possibility that Cerda's first degree murder conviction should not have been affirmed. We therefore recalled the remittitur in this case and requested supplemental briefing from Cerda and the Attorney General.

A.  Error under *Chiu*

As theories of liability for murder, the trial court instructed Cerda's jury on the natural and probable consequences doctrine, as well as on direct aiding and abetting principles. The instruction improperly permitted the jury to find that Cerda was guilty of first degree premeditated murder as a natural and probable consequence of the target crime of shooting at an occupied house. (*Chiu*, *supra*, 59 Cal.4th at p. 166.) The Attorney General properly concedes this error.

B.  Prejudice

As *Chiu* explained: "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.]" (*Chiu, supra,* 59 Cal.4th at p. 167; *People v. Aledamat* (2019) 8 Cal.5th 1, 13; *Chapman v. California* (1967) 386 U.S. 18, 24.) Cerda's first degree murder conviction must be reversed, unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory of direct aiding and abetting. (*Chiu*, at p. 167.)

The record demonstrates the jury convicted Cerda of first degree murder of Salazar under one of two theories. He was either a direct aider and abettor of premeditated murder, or an aider and abettor of shooting at an occupied house, which was the target offense under the natural and probable consequences

20

doctrine, with murder as the reasonably foreseeable nontarget offense.

The prosecutor argued these alternatives to the jurors. He explained that even if they assumed Cerda did not intend to kill, he was still guilty of murder under the natural and probable consequences doctrine because anyone would recognize that shooting at an occupied house with an assault rifle would result in an occupant's death.[13]

We cannot ignore the prosecutor's comments in our evaluation. Because the prosecutor urged the jurors to consider and utilize the natural and probable consequences doctrine, we cannot conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that Cerda directly aided and abetted the premeditated murder, and not on the legally invalid natural and probable consequences doctrine. (*In re Lopez*

---

[13] The prosecutor argued: "[L]et's even say that one of you at this point says, look, I don't think . . . they intended to kill anyone. I think that they were just shooting into a home and somebody just happened to die. [¶] The law says, even that is sufficient for you to convict of murder. Why is that? There's something called natural and probable consequences." The prosecutor continued: "Let me ask you this. I give you an AK-47 with 20 some odd rounds in it knowing that you are going to shoot up a house. An occupied house. You shoot up that house. Do I know that it's a natural and probable consequence that someone is going to die? Yeah. Unless I have an I.Q. of two, I know lighting up a house with an assault rifle, somebody is going to die. Cerda certainly knew that. And as such, he is guilty. He is guilty of the crime of murder. [¶] So would a reasonable person know? Yes. He knew that having Kyle Johnson shoot up that house, that somebody was going to die."

(2016) 246 Cal.App.4th 350, 360–361; *In re Loza* (2018) 27 Cal.App.5th 797, 806; *In re Johnson* (2016) 246 Cal.App.4th 1396, 1408.) Although the evidence was sufficient to support a finding of premeditation, there is simply no way to tell from the verdict whether the jury relied on the invalid natural and probable consequences theory or viewed Cerda as a direct aider and abettor of premeditated murder.

Based on the harmless beyond a reasonable doubt standard, we must reverse, even if it is highly unlikely the jury convicted Cerda based on the natural and probable consequences doctrine. (*In re Loza, supra*, 27 Cal.App.5th at p. 806.) We will vacate Cerda's first degree murder conviction and remand his case to the trial court for further proceedings.[14] According to *Chiu*, upon remand, the district attorney may accept a reduction of the conviction to second degree murder or retry the greater offense.[15] (*Chiu, supra,* 59 Cal.4th at p. 168.)]]

---

[14]  Because we reverse Cerda's first degree murder conviction, we need not address his argument from the original appeal regarding the insufficiency of evidence to support premeditated murder.

[15]  We reject Cerda's argument that the only proper remedy is to reduce his conviction to second degree murder. He reasons that because Johnson was convicted of second degree murder, allowing a retrial would encourage a jury to reach an inconsistent verdict. But our Supreme Court has sanctioned inconsistent premeditation findings. (See *People v. Palmer* (2001) 24 Cal.4th 856, 866–867.)

II.    Sufficient evidence to instruct on the kill zone theory

Attempted murder requires "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.)  When a defendant attempts to kill two or more persons by a single act, the element of intent to kill must be examined independently as to each alleged victim.  (*People v. Bland* (2002) 28 Cal.4th 313, 327–328 (*Bland*).)  Intent to kill cannot transfer from one attempted murder victim to another.  (*Id.* at pp. 328–329.)

Although intent to kill cannot transfer among victims, the Supreme Court in *Bland* provided for concurrent intent to kill to establish attempted murder against each person a defendant tries to kill by his or her single act.  (*Bland*, *supra*, 28 Cal.4th at p. 329.)  Concurrent intent would be established when the defendant, while targeting a specific person, tried to kill everyone in the area in which that person was located to ensure his or her death.  In doing so, the defendant would specifically intend to kill everyone in that area.  (*Ibid.*)  The Court labeled this area around the primary target victim the "kill zone."[16]  (*Bland*, *supra*, 28 Cal.4th at p. 330.)  This kill zone theory allows for a conviction of attempted murder against any victim who was in the specified area but was not the defendant's primary target.  (*Id.* at pp. 329–330; *People v. Smith* (2005) 37 Cal.4th 733, 745–746.)

*People v. Canizales*, *supra*, 7 Cal.5th at page 607, limited the application of the kill zone theory.  Under *Canizales*, the kill

---

[16]    The Supreme Court adopted the term "kill zone" from the Maryland case of *Ford v. State* (Md.Ct.App. 1993) 625 A.2d 984, 1000–1001.  (*Bland*, *supra*, 28 Cal.4th at p. 329.)

23

zone theory may only be applied when: "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of the force [he or she] used, are such that the only reasonable inference is that [he or she] intended to create a zone of fatal harm … around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of [fatal] harm." (*Ibid*.)

*Canizales* further elaborated that in determining the intent to create a kill zone and the scope of the kill zone, the circumstances of the attack include "the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

For a jury to be instructed that it may draw an inference, as the instruction on the kill zone theory does, the record must contain evidence that would support the suggested inference, if believed by the jurors. (*Canizales*, *supra*, 7 Cal.5th at p. 609.) As we will discuss, substantial evidence supported Cerda's and Johnson's intent to kill everyone within the respective kill zones at the Katrina Place and Morning Circle shootings.

A. Intent to create a kill zone

We begin by assessing the circumstances of each attack. For both the Katrina Place and Morning Circle incidents, the shooters used an AK-47 assault rifle. Criminalist Keil explained that the high caliber ammunition from such an assault rifle travels at up to four times the velocity of handgun ammunition. The AK-47 rounds have the potential for penetrating substantial barriers.

24

The sixteen shots fired from the assault rifle decimated the house on Katrina Place.[17]  All sixteen shots penetrated the exterior walls.  Many also penetrated internal walls and fixtures.  This was not an indiscriminate shooting.  The shots grouped around the locations where the victims were congregating.  They focused on the garage and the dining room on the first floor, and the bedrooms on the second floor.  The shots killed one person, and debris from the damage also injured two others.  The location of the casings in the street indicated that the truck stopped in front of the house, allowing the shooter to fire from a close range.  The two groups of casings further suggested to Keil that the shooter fired eleven shots from a stationary position, then turned or moved to another location and fired the remaining five shots.  This deliberate positioning of the shooter and placement of shots further support his targeting specific locations of the house where the victims were present.

Only thirty minutes later, Cerda shot at the Morning Circle house with the same intent to create a kill zone.  The group employed the same tactics as those at the Katrina Place house.

---

[17]  We reject Cerda's contention that the use of an AK-47 assault rifle would only signify an intent to kill if the shooter had prior knowledge of the gun's capabilities and use in a manner to strike targets.  As we discuss, the rifle was used to strike targets inside the house.  But neither *Canizales* nor its precursors ever required knowledge of the utilized weapon's capabilities.  On the contrary, *Canizales* suggested considering, among other factors, only *the type of weapon used*.  (*Canizales, supra,* 7 Cal.5th at p. 607.)  Moreover, both Cerda and Johnson would have witnessed multiple shots fired from the AK-47.  After one shot was fired, both could sufficiently appreciate the assault rifle's capabilities.

25

The truck pulled up in front of the house. Cerda fired shots from a stationary position in the bed of the truck, while Johnson and the others remained in the passenger compartment. Cerda fired close to the front of the house, as the location of the four spent casings and four live rounds indicated.

Most significantly, Cerda fired the same high-velocity ammunition from the same military-style assault rifle, which had been fired only thirty minutes before. Multiple shots again penetrated the exterior. One entered the master bedroom where Vicente V. and his wife were sleeping. Another struck a staircase leading to another bedroom. Other bullets were embedded in the exterior walls. The six damaged areas of the house suggested Cerda fired at least six shots, although only four spent casings were discovered. Notably, there were nine victims in the Morning Circle Place house, five fewer than in the Katrina Place house. If one 7.62 by 30-millimeter round could penetrate multiple barriers, it certainly could have penetrated multiple human beings.

Although Cerda fired fewer shots and did not injure anyone, a determination of the intent to create a kill zone "does not turn on the effectiveness or ineffectiveness of [his] chosen method of attack." (*Canizales*, *supra*, 7 Cal.5th at p. 611.) Moreover, *Canizales* explained that the number of shots is relevant to the determination of intent to create a kill zone, but it is not dispositive. (*Ibid*.)

The facts of both shootings stand in stark contrast to those in *Canizales*. The shooter in *Canizales* fired shots at his primary target from 100 to 160 feet away. The shooting occurred at a block party on a wide city street, open and unconfined by any structure. (*Canizales*, *supra*, 7 Cal.5th at p. 610.) Bullets were

26

described as "going everywhere," rather than targeting specific victims. (*Ibid*.) Moreover, the shooter fired lower-powered nine-millimeter rounds from a handgun.

Cerda and Johnson assert that an intent to intimidate, as an alternative to an intent to kill, could reasonably be inferred from the circumstances of the attacks.[18] They highlight testimony by Detective Gillis which recognized that a gang member could commit a shooting with the intent to intimidate without also intending to kill.

However, Gillis commented on a hypothetical situation where a gang member fired shots into an *unoccupied* car, rather than an occupied house. Gillis qualified, "In gang life, it can't be painted so broad. Each case is different." In the situation of an unoccupied car, the shooter could have no intent to kill because there would be no victim to kill. Gillis's testimony does not suggest that alternative reasonable inferences, including an intent to intimidate, could be drawn from circumstances of the attacks in this case.

Gillis was clear. He testified that the sole purpose for using an AK-47 was to kill. Especially for the Katrina Place incident, the shooting was more than mere retaliation. It was committed "with an exclamation point." The intent to kill was

---

[18] Cerda also contends that the prosecutor "conceded the existence of multiple inferences." But the prosecutor did no such thing. Moreover, the prosecutor's argument is not the evidence we evaluate to determine whether the instruction on the kill zone theory was proper. *Canizales* evaluated the prosecutor's closing argument only to determine whether the error in instructing on the kill zone was prejudicial. (*Canizales*, *supra,* 7 Cal.5th at pp. 613–614.) There was no error here, as we discuss.

supported by Cerda's and Johnson's statements, as recounted by Pedro A. Cerda stated, "We're going to get them fools, you know. A gun and some other foolio." Johnson demanded, "[T]onight. Fuck that." This exchange represents Cerda's proposal of killing the 18th Street gang members who beat up Johnson. It also shows Johnson's intention to retaliate immediately. The only reasonable inference to be drawn from the use of the assault rifle at the Katrina Place incident was the intent to kill everyone occupying the house. We draw the same inference from the Morning Circle shooting, which occurred soon after the Katrina Place shooting.

Both Cerda and Johnson further argue that no primary target existed in each shooting, rendering the kill zone theory inapplicable. We disagree.

*Canizales* required a primary target for the application of the kill zone theory. (*Canizales*, *supra*, 7 Cal.5th at p. 608.) The kill zone theory addresses whether a defendant who murders or attempts to murder an intended target can be convicted of attempted murder of nontargeted persons. (*Ibid*; *People v. Stone* (2009) 46 Cal.4th 131, 138.) When the defendant has the intent to kill a particular target, for attempted murder liability under the kill zone theory, the jurors must infer his or her concurrent intent to kill the nontargeted persons. (*Ibid*.) Intent to kill the others could not be concurrent to an intent to kill a primary target if there was no primary target.

Vicente V. was the primary target at the Morning Circle house. According to Deputy Gillis, Vicente V. was a founding member of the Val Verde Park gang. His family had been associated with the gang for two generations. Vicente V., as well as Gillis, identified his son, Vince, Jr., as a Val Verde Park gang

28

member.  Vince, Jr., was also present at the house at the time of the shooting.  Cerda and Johnson were affiliated with LMS, which was the rival gang of Val Verde Park.

At the Katrina Place house, the primary targets were the 18th Street gang members who beat up Johnson earlier at the party.  Although these 18th Street gang members were never identified, neither *Canizales*, nor any other case, required that the primary target be identified by name.  Nor is it required that the defendant know the primary target was present at the time of the attack.  An *intended* target is all that is required.  Cerda and Johnson sought to retaliate against the 18th Street gang members.  According to Detective Gillis, a gang member must retaliate with equal or greater force to protect the dignity of his or her gang.  A mistaken belief that the primary targets were present would not make Cerda or Johnson less culpable.

Upon considering the circumstances of the attack, including the power of the assault rifle used, the number and placement of shots, and the position and close range from which the shootings occurred, we conclude the evidence supported Johnson's and Cerda's respective intent to create a kill zone in the Katrina Place house and in the Morning Circle house.

B.  Scope of the zone

The second prong of the test formulated by *Canizales* evaluates the scope of the kill zone.  Specifically, we must determine whether the non-primary target victims were located within the kill zone for each shooting.  (*Canizales*, *supra*, 7 Cal.5th at p. 607.)  An area where the victims were subjected to mere risk of lethal harm is insufficient.  It must be an area in which the shooter intended to kill everyone.  (*Ibid.*)

Again, the circumstances of the attack inform our determination.[19] The scope of each kill zone encompassed the entire house in each shooting. We base this conclusion on the use of the high-powered assault rifle, the damage to the interiors of the houses by the penetration of bullets through the exterior walls, the close range from which the shooter fired, and the number and placement of shots. During the brief time of each shooting, the named victims in counts 1 through 14 and 15 through 24 were confined to the Katrina Place house and Morning Circle house, respectively. Accordingly, each victim was located within the respective kill zone for each shooting.

Cerda and Johnson argue that the kill zone theory could not properly apply because the evidence did not reveal whether they knew where each victim was located within each house. Cerda further contends that *People v. Adams* (2008) 169 Cal.App.4th 1009, and *People v. Vang* (2001) 87 Cal.App.4th 554 (*Vang*), should not be cited for the proposition that a shooter may attempt to kill persons even though he or she is unaware of their presence.

We disagree. *Vang* was cited with approval in *Bland*, *supra*, 28 Cal.4th at page 330, *Stone*, *supra*, 46 Cal.4th at page 140, and *Canizales*, *supra*, 7 Cal.5th at page 610. *Vang* concluded that despite each shooter's inability to see all victims in the two targeted houses, the jury could reasonably infer the intent to kill every person in each house, based on the placement

---

[19] Because the Supreme Court concluded that the evidence was insufficient to support a finding that the defendants intended to create a kill zone, it did not determine the scope of the zone. (*Canizales*, *supra*, 7 Cal.5th at p. 611.)

of shots, the number of shots, and the use of high-powered, wall-piercing firearms.[20]  (*Vang*, *supra*, 87 Cal.App.4th at p. 564.)

In *Adams*, the reviewing court held, "Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims were actually within the zone of harm."  (*People v. Adams*, *supra*, 169 Cal.App.4th at p. 1023.)  This holding, along with the holding in *Vang*, is consistent with *Canizales*.  The second prong of *Canizales* specifically requires the non-primary target to be located within the kill zone.  (*Canizales*, *supra*, at p. 607.)

The visibility of the victims and the shooter's awareness of their locations are relevant but not dispositive, as they might be in cases where the shooter fires a single shot from a handgun. (See *People v. Smith*, *supra*, 37 Cal.4th at p. 748.)  The attacks here were of such a magnitude that knowledge of the victims' specific locations was not necessary.  The intent was to kill everyone in each house.  Because each attempted murder victim was located inside either the Katrina Place house or the Morning Circle house at the times of the respective shootings, he or she was within a kill zone created by Cerda and Johnson.  Thus, substantial evidence supported the second prong, as well as the

---

[20]  Cerda and Johnson try to distinguish *Vang*.  They argue that the primary targets were not visible to the shooters here, as they were in *Vang*.  This distinction is of little consequence.  As we have discussed, the physical presence of a primary target is not essential.  All that is required is that the shooters intended kill someone.  Moreover, at issue in *Vang* was the sufficiency of evidence to support the attempted murders of the nine non-visible victims.

first prong, of the *Canizales* test.  Accordingly, we conclude the kill zone theory was properly applied.[21]

**[[**III.  Senate Bill No. 1437

Effective January 1, 2019, SB 1437 modified the law relating to accomplice liability for murder by amending sections 188 and 189.  (Stats. 2018, ch. 1015, § 2–3.)  SB 1437 redefined malice in section 188, prohibiting its imputation to a person based solely on his or her participation in a crime.  (§ 188, subd. (a)(3).)  Subdivision (e) of section 189 now requires liability under the felony murder rule to be limited to three scenarios:  (1) the person was the actual killer; (2) with intent to kill, the person aided and abetted the actual killer in the commission of first degree murder; or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life.

SB 1437 also eliminated liability for murder under the natural and probable consequences doctrine.  As discussed earlier, liability under the natural and probable consequences doctrine was not premised on the intention of the aider and abettor of the target crime to commit the nontarget crime because it was never intended.  (*Chiu*, *supra*, 59 Cal.4th at p. 164.)  Liability depended only on the foreseeability of the nontarget crime.  Accordingly, because SB 1437 requires murder liability to be based on a person's mental state and prohibits the imputation of malice to a person based solely on his or her participation in a

---

[21]     Because we conclude substantial evidence supported the kill zone theory instruction, we need not reach Cerda's and Johnson's argument that instructing on the kill zone theory was prejudicial.

32

crime, the natural and probable consequences doctrine can no longer serve as a theory of liability for murder.

SB 1437 added section 1170.95, which provides for persons to petition to vacate their convictions and be resentenced, if they could not have been convicted of first or second degree murder as a result of the changes to sections 188 and 189. (§ 1170.95, subd. (a).) Specifically, eligible petitioners would include persons convicted of murder under the natural and probable consequences doctrine or felony murder, except as stated in section 189, subdivision (e). If the petitioner makes a prima facie showing that he or she falls within the provisions of section 1170.95, the trial court must issue an order to show cause on the prosecuting agency. (§ 1170.95, subd. (c).) The trial court must hold a hearing to determine whether to vacate the conviction for murder and to recall the sentence. (§ 1170.95, subd. (d)(1).) The trial court must vacate the conviction and resentence the petitioner, if the prosecutor fails to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing. (§ 1170.95, subd. (d)(3).)

A. Retroactive application of SB 1437

Johnson argues that SB 1437 applies retroactively to him, allowing him to seek relief for his murder conviction without complying with the petition procedure under section 1170.95.[22]

---

[22] Cerda did not raise this issue. However, Cerda and Johnson attempt to join one another's claims, including those for which they failed to provide any argument. The Supreme Court disapproves of this improper tactic. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 (*Bryant*).) "Purporting to join in a claim when no colorable argument can be made that the claim is applicable and preserved is akin to raising a frivolous claim in the first instance." (*Ibid.*) If an appellant's brief does

Cases have rejected arguments like Johnson's.[23] (*People v. Martinez* (2019) 31 Cal.App.5th 719, 727 (*Martinez*); *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1152 (*Anthony*); *People v. Munoz* (2019) 39 Cal.App.5th 738, 752; *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1113.[24]) We agree with these cases and reject Johnson's arguments.

Generally, a new law that reduces the punishment for a crime is presumed to apply to defendants whose judgments are not yet final as of the law's effective date. (*In re Estrada* (1965) 63 Cal.2d 740, 745 (*Estrada*).) This rule reflects the legislature's general intent "for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." (*People v. Conley* (2016) 63 Cal.4th 646, 657 (*Conley*).) But the Legislature or electorate may opt to modify, limit, or prohibit the retroactive application of such ameliorative amendments. (*Id.* at p. 656.) If the Legislature indicates its intent to make the law prospective only, by an express savings clause or its equivalent,

---

not provide legal argument and citation to authority on each point raised, the court may treat it as waived. (*Ibid.*) We would reject any claim on this issue, even if Cerda had raised it.

[23] To address whether SB 1437 applies retroactively to cases not yet final on appeal, among other questions, the Supreme Court has granted review in *People v. Gentile* (review granted and opinion E069088 deleted upon direction of Supreme Court by order dated September 11, 2019, S256698).

[24] As we discuss below, the Supreme Court has granted review on other issues in *People v. Munoz* (review granted Nov. 26, 2019, S258234) and *People v. Lopez* (review granted Nov. 13, 2019, S258175).

the *Estrada* presumption is rebutted.  (*Martinez, supra*, 31 Cal.App.5th at pp. 724–725; *Estrada*, at p. 747.)

SB 1437 is not silent on the question of retroactivity. Section 1170.95 does apply retroactively, but provides specific retroactivity rules which permit a petitioning process to seek the vacating of convictions and recall of sentences for eligible persons convicted of murder under the natural and probable consequences doctrine or certain theories of felony murder.[25]  The petition must be filed in the sentencing court with a declaration by the defendant stating he or she is eligible for relief based on criteria in section 1170.95, subdivision (a).  (§ 1170.95, subd. (b)(1)(A).)  This petition procedure does not distinguish between persons whose sentences are final and those whose sentences are not.  Because the Legislature created this procedure in section 1170.95 by which defendants may avail themselves of the change in the murder law, SB 1437 should not be applied retroactively to nonfinal convictions on direct appeal. (*Martinez, supra*, 31 Cal.App.5th at p. 727; *Anthony, supra*, 32 Cal.App.5th at p. 1152.)

---

[25]    As part of the petitioning procedure, section 1170.95 permits parties to submit additional evidence, as well as rely on the record of conviction, at the hearing to determine whether to vacate the conviction and recall the sentence.  (§ 1170.95, subd. (d)(3).)  *Martinez* noted that this feature demonstrates that SB 1437 does not categorically provide a lesser punishment or automatically entitle petitioners to new trials.  (*Martinez, supra*, 31 Cal.App.5th at pp. 727–728.)  It provides an opportunity to go beyond the original record, which is impermissible on direct appeal.  Accordingly, this feature supports the legislative intent to require defendants to use the petition process in section 1170.95, rather than attempt to proceed via direct appeal.  (*Ibid.*)

Our view of SB 1437 is supported by the Supreme Court's conclusions about Proposition 36[26] (§ 1170.126) and Proposition 47[27] (§ 1170.18). (*Conley*, *supra*, 63 Cal.4th at pp. 661–662; *People v. DeHoyos* (2018) 4 Cal.5th 594, 597 (*DeHoyos*).) Both are ameliorative statutes which provide for the recall of sentences. Both created postconviction procedures for resentencing that do not distinguish between persons serving final and nonfinal sentences. Additionally, relief depends on the trial court's evaluation of the petitioner's risk to public safety if released. (*Conley*, at p. 657; *DeHoyos*, at p. 603.) An automatic entitlement to relief for defendants whose cases were still pending on direct appeal would bypass this inquiry. Because both Propositions 36 and 47 were not silent on retroactivity, the Supreme Court concluded the petitioning procedure in each was intended to be the exclusive avenue for retroactive relief, regardless of whether

---

[26]    Proposition 36, the Three Strikes Reform Act of 2012, amended the Three Strikes law to reduce punishment prescribed for offenders with two or more prior convictions for serious or violent felonies. (Prop. 36, as approved by voters, Gen. Elec. (Nov. 6, 2012).) Proposition 36 also authorized persons presently serving indeterminate terms pursuant to sentencing under the Three Strikes law to seek resentencing. (§ 1170.126, subd. (a).)

[27]    Passed in 2014, Proposition 47, the Safe Neighborhoods and Schools Act, reduced the punishment for certain theft and drug related offenses, making them punishable as misdemeanors. (Prop. 47, as approved by voters, Gen. Elec. (Nov. 4, 2014).) Proposition 47 also permitted persons serving felony sentences to seek a reduction in their convictions from felony to misdemeanor status. (§ 1170.18, subd. (a).)

the sentence was final. (*Conley*, at pp. 661–662; *DeHoyos*, at p. 603.)

Johnson tries to distinguish section 1170.95 from Propositions 36 and 47, which mandate a separate inquiry into a defendant's risk to public safety if released. He argues that this dangerousness inquiry limits relief, unlike section 1170.95 which provides relief based only on whether a defendant could be properly convicted of murder under the revised statutes.

This distinction is of little consequence. The determination of the legislative intent to limit retroactive application of Propositions 36 and 47 did not depend on the dangerousness inquiry. (*Conley*, *supra*, 63 Cal.4th at pp. 656–657; *DeHoyos*, *supra*, 4 Cal.5th at p. 605.)

Moreover, Johnson minimizes the substantive requirement for relief imposed by section 1170.95. A trial court must determine whether a defendant could not have been convicted of murder under the amended sections 188 and 189. (§ 1170.95, subd. (a)(3).) This procedure requires factual findings on the defendant's participation in the crime. This process reflects the Legislature's intent to restrict defendants to the petition procedure in section 1170.95, rather than allow relief on direct appeal.

To further support his position that the petition procedure was not meant to exclude the right to raise a claim on direct appeal, Johnson cites section 1170.95, subdivision (f), which states, "This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner." But this provision contains no indication that the rights to be preserved include automatic relief on direct appeal without compliance with

37

the petition procedure.  (*Martinez*, *supra*, 31 Cal.App.5th at p. 729; *Anthony*, *supra*, 32 Cal.App.5th at p. 1157.)

Finally, Johnson asserts that if the petition procedure is his exclusive remedy, the right to new factual determinations about his murder liability would be made by a court rather than by a jury.  He argues that such a conclusion would violate his constitutional right to a jury trial.

*Anthony* rejected a similar argument.  The retroactive relief provided by SB 1437 constitutes a legislative act of lenity that does not implicate the right to a jury trial under the Sixth Amendment.  (*Anthony*, *supra*, 32 Cal.App.5th at pp. 1156–1157: *People v. Perez* (2018) 4 Cal.5th 1055, 1063–1064.)

We conclude neither Johnson nor Cerda may obtain relief under SB 1437 by direct appeal.  Any claim for retroactive relief must be raised by petition before the sentencing court in the first instance, as provided in section 1170.95.[28]  Nothing in our discussion is intended to suggest any opinion on the merits of such a petition.

---

[28]  Johnson also argues the trial court incorrectly instructed on aiding and abetting and the natural and probable consequences doctrine, based on the amendments to the murder law by SB 1437.  He contends reversal is required because it cannot be determined whether the jury based its guilty verdict for the murder conviction on express or implied malice, or on the natural and probable consequences doctrine.  Johnson must present this argument in a petition under section 1170.95.  It expressly requires a determination of whether he could be convicted of murder because of the changes to the murder law by SB 1437.  (§ 1170.95, subd. (a)(3).)

B. SB 1437 does not apply to attempted murder

Cerda and Johnson urge us to extend to attempted murder the prohibition of murder liability under the natural and probable consequences doctrine, as established by SB 1437.[29] We decline.[30]

1. Plain language

The words of the statute provide the starting point for statutory interpretation. (*People v. Colbert* (2019) 6 Cal.5th 596, 603.) We afford the words their ordinary meaning and view them in the context of the statute. If the words are not ambiguous, the plain meaning governs. (*Ibid.*)

SB 1437 is not ambiguous. Attempted murder is not included in sections 188, 189, or 1170.95.[31] Each section contains

---

[29] The Supreme Court has granted review on this issue in *People v. Lopez* (S258175, review granted Nov. 13, 2019) and *People v. Munoz* (S258234, review granted Nov. 26, 2019).

[30] Because we conclude that SB 1437 does not apply to attempted murder, we need not reach Johnson's claims of instructional error related to the natural and probable consequences doctrine as applied to attempted murder.

[31] The uncodified statement of legislative findings and declarations provides, "It is necessary to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, §1, subd. (f).) The reference to the natural and probable consequences doctrine includes only its

only references to the terms murder or killer.  Additionally, section 189, subdivision (e) uses the term "attempted" in permitting completed and attempted felonies for the underlying felony of felony murder.  However, "attempted" is omitted from the same sentence when addressing the participant's liability for murder.  (§ 189, subd. (e).)  A term should not be implied where it was excluded when it was employed in one place and excluded in another.  (*People v. Buycks* (2018) 5 Cal.5th 857, 880; *Bland*, *supra*, 28 Cal.4th at p. 337.)  The Legislature knows how to create a statute which would encompass both a completed crime and an attempt.  (*People v. Jillie* (1992) 8 Cal.App.4th 960, 963.)  The plain language of each section compels the conclusion that SB 1437 applies only to murder and does not extend to attempted murder.

2.  No absurd consequences

Cerda and Johnson contend that construing SB 1437 to apply to murder, but not attempted murder, would result in more severe punishment for attempted murder.  They assert that other remedial legislation includes application to lesser offenses.[32]

---

application to murder.  Other portions also reference only "murder" in the context of the malice requirement.  (*Ibid*.)

[32]    Johnson argues that attempted murder is a lesser included offense of murder.  However, an attempted offense is not necessarily a lesser included offense of a completed offense.  For example, attempted murder includes a "particularized intent that goes beyond what is required by the completed offense." (*People v. Bailey* (2012) 54 Cal.4th 740, 752–753.)  Attempted murder requires intent to kill.  As an alternative to intent to kill, murder may be committed with implied malice.  (§ 188.)

They cite two cases which discussed the absurd results of a statute's failure to include attempted crimes.

The first case cited by Cerda and Johnson is *People v. King* (1995) 5 Cal.4th 59. *King* considered the confusion created by the interplay of multiple statutes used to determine the eligibility of juveniles for commitment to the former California Youth Authority, rather than state prison. The specific juveniles under consideration were convicted of first degree murder and attempted premeditated murder in adult court. A literal interpretation of the statutes would have resulted in ineligibility of juveniles who were convicted of attempted premeditated murder, but not first degree murder. However, the legislative history indicated an intent for the eligibility of juveniles convicted of either first degree murder or attempted premeditated murder. The Court reasoned this intent should prevail over any irrational result caused by three interrelated statutes.[33] (*People v. King, supra,* at pp. 69–70.)

The second case cited by Cerda and Johnson is *People v. Barrajas* (1998) 62 Cal.App.4th 926, which permitted a drug diversion law to apply to the attempted possession of a controlled substance, despite its plain language including only completed possession. The reviewing court concluded that it would make little sense if the Legislature intended to include persons who acquired drugs but exclude persons who wanted to acquire drugs but were unable to do so. (*Id*. at p. 930.)

In contrast to the situations presented by *King* and *Barrajas*, SB 1437 does not call for the application of the so-called

---

[33]    The Court interpreted sections 190, subdivision (a), and 664, and Welfare & Institutions Code section 1731.5.

absurd consequences doctrine.  Generally, this doctrine directs reviewing courts to not give the language of a statute its literal meaning if doing so would result in absurd consequences which the Legislature or the electorate did not intend.  (*Bruce v. Gregory* (1967) 65 Cal.2d 666, 674; *People v. Cook* (2015) 60 Cal.4th 922, 927; *People v. Hagedorn* (2005) 127 Cal.App.4th 734, 743.)  "To this extent, therefore, intent prevails over the letter of the law and the letter will be read in accordance with the spirit of the enactment." (*In re Michele D.* (2002) 29 Cal.4th 600, 606.)

Unlike the statutes in *King* and *Barrajas*, the literal meaning of SB 1437 does not result in absurd consequences.  It does not mandate a harsher punishment or prohibit a more lenient sentence for attempted murder.  It does not even prescribe punishment for either murder or attempted murder.  After the enactment of SB 1437, the punishment for attempted murder remains the same.  In its determinate or indeterminate form, the punishment remains less than the punishment for murder.  (*Chiu, supra,* 59 Cal.4th at p. 163.)

3.  No equal protection violation

Cerda and Johnson argue that if SB 1437 does not include persons convicted of attempted murder under the natural and probable consequences doctrine, it violates equal protection.

a.  Not similarly situated to persons convicted of murder

Equal protection of the laws requires equal treatment of similarly situated persons, unless a sufficient reason exists to treat them differently.[34]  (*People v. Morales* (2016) 63 Cal.4th 399,

---

[34]  Both the state and federal constitutions provide for equal protection. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).)  The California Supreme Court has noted that it has

408; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) We must first determine whether there are two groups of persons who are similarly situated but are being treated differently under the law at issue. (*Cooley*, at p. 253; *People v. Barrett* (2012) 54 Cal.4th 1081, 1107.) The law does not violate equal protection if the two groups are not similarly situated or the law does not treat them differently.

Persons charged with, or convicted of, attempted murder are not similarly situated with persons charged with, or convicted of, murder. Murder is a distinct offense from attempted murder. It is punished more harshly than attempted murder. (§§ 190, 664, subd. (a).) It also requires proof of different elements. (§§ 187, 188, 664.)

SB 1437 was enacted to "more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § 1, subd. (b).) The Legislature was permitted to treat these properly distinguishable groups of offenders differently. It is irrelevant if they are otherwise indistinguishable. (*Barrett*, *supra*, 54 Cal.4th at p. 1107.) Cerda and Johnson offer no persuasive reason to view the two groups as similarly situated. Accordingly, their equal protection claim fails.

---

"not distinguished the state and federal guarantees of equal protection for claims arising from allegedly unequal consequences associated with different types of criminal offenses." (*People v. Chatman* (2015) 4 Cal.5th 277, 287.)

b. Rational basis review

Even assuming the two groups consist of similarly situated persons, sufficient reasons exist to treat them differently. (*Chatman*, *supra*, 4 Cal.5th at p. 288.) The extent of justification depends on the nature of the classification. (*Ibid.*) The highest level of scrutiny is required only if the unequal treatment is based on a suspect classification, such as race, or if it affects a fundamental right. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836 (*Wilkinson*); *Chatman*, at p. 288.) The state would have the burden of establishing a compelling interest which justifies the law and the distinctions created by the law are necessary to further its purpose. (*Chatman*, at p. 288.) Where the law does not draw a suspect classification nor burden fundamental rights, it must be "rationally related to a legitimate governmental purpose." (*Wilkinson*, at p. 836.) In such cases, the classification is presumed rational unless no reasonably conceivable rational basis exists for the unequal treatment. (*Chatman*, at p. 289.)

Preliminarily, we reject Cerda's and Johnson's arguments that the strict scrutiny standard applies for their equal protection claim. Specifically, they contend that the punishment for the crimes affects a criminal defendant's fundamental right of liberty. However, "where the issue is not whether a deprivation of an individual's liberty will occur, but rather the duration of that deprivation, rational basis review is appropriate." (*People v. K.P.* (2018) 30 Cal.App.5th 331, 343.) The legislative branch has the exclusive power to define crimes and fix penalties. (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 516.) A defendant "does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives." (*Wilkinson*, *supra*, 33 Cal.4th at p. 838; *People v.*

44

*Martinez* (2016) 5 Cal.App.5th 234, 243.)  Thus, rational basis review is appropriate for an equal protection challenge to the limitation of the ameliorative provisions of SB 1437 to murder.

Under the rational basis test, "equal protection of the law is denied only where there is no rational relationship between the disparity of treatment and some legitimate governmental purpose.  [Citations.]" (*People v. Martinez, supra*, 5 Cal.App.5th at p. 244; *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*).)  The underlying rationale need not be "empirically substantiated." (*Johnson*, at p. 881.)  Nor must the Legislature ever actually have articulated the purpose to be achieved.  (*Ibid*.)  To mount a successful rational basis challenge, a party must negate every basis "that might support the disputed statutory disparity." (*Ibid*.)

The Legislature's decision to limit sentencing reform to murder was rational.  First, the Legislature wanted punishment for murder commensurate with a person's individual culpability.  (Stats. 2018, ch. 1015, § 1, subds. (b), (d); *Munoz, supra*, 39 Cal.App.5th at p. 763.)  In cases applying the natural and probable consequences doctrine, the gap is greater between the culpability for aiding and abetting the less serious target offense and the nontarget offense of murder than it is for a nontarget offense of attempted murder.  The Legislature has the prerogative to first address a problem which it deems most pressing, leaving other related problems for another day.  (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 488.)

Second, a financial savings would result from limiting the scope of the petitions under section 1170.95 to murder

45

convictions.[35]  (*Munoz, supra*, 39 Cal.App.5th at pp. 763–764.)
Such a savings would justify treating persons with murder
convictions differently from persons with attempted murder
convictions.  "Preserving the government's financial integrity and
resources is a legitimate state interest." (*Chatman, supra*, 4
Cal.5th at p. 290.)

We conclude that plausible reasons existed for the
Legislature to not extend its ameliorative provisions to attempted
murder.  Accordingly, we reject Cerda's and Johnson's equal
protection claim against the Legislature's decision to limit reform
of murder liability under the natural and probable consequences
doctrine.

IV.    Liability for attempted premeditated murder under the
natural and probable consequences doctrine

Cerda and Johnson argue that the premeditation findings
as to each count of attempted murder should be reversed.  They
assert that the jurors were improperly instructed they could find
premeditation for each attempted murder under the natural and
probable consequences doctrine without a determination that

---

[35]    The Senate and Assembly Appropriations Committees
examined the potential financial impact of the resentencing
provision in section 1170.95, which included processing the
petitions and transporting inmates to hearings.  (Sen. Com. on
Appropriations, Analysis of Sen. Bill No. 1437 (2017–2018 reg.
Sess.) May 14, 2018, p. 1; Assem. Com. on Appropriations,
Analysis of Sen. Bill 1437 (2017–2018 Reg. Sess.) Aug. 8, 2018,
p. 1.)  The estimated additional court workload cost was $7.6
million, if ten percent of the inmates eligible for relief petitioned
the court for recall of sentence and resentencing for their murder
convictions.  (Sen. Com. on Appropriations, May 14, 2018, *supra*,
p. 3.)

attempted premeditated murder was a foreseeable consequence of the target crime.[36]

The Supreme Court addressed this issue in *People v. Favor* (2012) 54 Cal.4th 868, 879–880. The Court held that a trial court need only instruct the jury to find that attempted murder, not attempted premeditated murder, was a foreseeable consequence of the target offense. The jury would separately determine whether the attempted murder itself was premeditated. (*Id.* at p. 880.)

Cerda and Johnson cite *People v. Mejia* (2019) 40 Cal.App.5th 42, which extended *People v. Chiu.* As discussed earlier, in *Chiu*, the Supreme Court held that a first degree premeditated murder conviction for an aider and abettor cannot be based on the natural and probable consequences doctrine. (*Chiu, supra*, 59 Cal.4th at p. 166.) *Chiu* reasoned that the connection between a murderer's premeditative state and the culpability of an aider and abettor of a target crime is too attenuated to impose first degree murder liability on the aider and abettor under the natural and probable consequences doctrine. (*Id.* at p. 166.) Murder liability under the natural and probable consequences doctrine was incompatible with a mental state like premeditation which was "uniquely subjective and personal." (*Id.* at p. 167.)

*Mejia* similarly concluded that a finding of premeditation for attempted murder cannot be based on the natural and probable consequences doctrine. (*Mejia, supra*, 40 Cal.App.5th at p. 50.) The court reasoned that premeditation "is no less

---

[36] The Supreme Court has granted review on this issue in *People v. Lopez* (S258175, review granted Nov. 13, 2019).

47

subjective and personal in the context of attempted murder than it is in the context of murder." (*Id*. at p. 49.)

Cerda and Johnson urge us to agree with *Mejia*. However, *Chiu* did not overrule *Favor*.[37]  *Chiu* merely determined that sufficient distinctions exist between attempted premeditated murder and premeditated murder to justify a different result from *Favor*.[38]  (*Chiu, supra*, 59 Cal.4th at p. 162.)  Thus, even if we agree with *Mejia* that *Favor* and *Chiu* are indistinguishable, we must follow *Favor*.[39]  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

---

[37]   The Supreme Court has granted review on this issue in *People v. Lopez* (S258175, review granted November 13, 2019.) The questions before the Supreme Court include whether *Favor* should be reconsidered in light of *Chiu*.

[38]   *Chiu* noted that premeditation is an element of first degree murder, in contrast to a requirement for a penalty provision as it is with attempted murder.  (*Chiu, supra*, 59 Cal.4th at p. 163.) *Chiu* also characterized the consequence of imposing the penalty provision to attempted murder as less severe than in imposing first degree murder liability under the natural and probable consequences doctrine.  (*Ibid*.)

[39]   Johnson cites cases to argue that the instruction allowed the jury to impute the perpetrator's premeditation to him, obviating the due process requirement that the jury find beyond a reasonable doubt every fact increasing punishment.  (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 494, fn. 19; *Alleyne v. United States* (2013) 570 U.S. 99, 111–112.)  *Favor* rejected this argument by characterizing attempted premeditated murder and attempted unpremeditated murder as the same offense.  (*Favor, supra*, 54 Cal.4th at p. 876.)  The Court reasoned that premeditation does not create a greater degree of attempted murder.  Instead, it is only a requirement for a penalty provision,

V.    The "equally guilty" language in CALCRIM No. 400

Cerda and Johnson contend their convictions must be overturned because the trial court instructed the jury with a superseded version of CALCRIM No. 400. Their complaint is with the statement that "[a] person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it."[40]  (CALCRIM No. 400.)  Cerda and Johnson contend they were prejudiced by the "equally guilty" formulation in the prior version of CALCRIM No. 400 because it improperly tethered one's culpability for attempted premeditated murder (and premeditated murder for Cerda) to the mental state of the other.

---

rather than a substantive offense.  (*Id.* at pp. 876–877.)  The Supreme Court previously granted review in *People v. Mateo* (review granted May 11, 2016, S232674) to address whether aider and abettor liability under the natural and probable consequences doctrine must require attempted premeditated murder to be a foreseeable consequence of the target offense.  The Court was to determine whether *Favor* should be reconsidered in light of *Alleyne*.  However, it transferred the matter back to the Court of Appeal without deciding this issue.  *Mejia* also did not address the impact of *Alleyne* on *Favor*.  (*Mejia, supra,* 40 Cal.App.5th at p. 51, fn. 3.)  But as noted, the Supreme Court has granted review on this issue in *People v. Lopez* (review granted November 13, 2019, S258175.)

[40]    In April 2010, the Judicial Council amended CALCRIM No. 400 to omit the "equally guilty" language.  (*People v. Johnson* (2016) 62 Cal.4th 600, 640.)  The final sentence now reads:  "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."  (CALCRIM No. 400.)

49

A.  CALCRIM No. 400 would not have misled the juries

The "equally guilty" language "generally stated a correct rule of law." (*Bryant*, *supra*, 60 Cal.4th at p. 433; *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 846 (*Daveggio*).)  A perpetrator and an aider and abettor are equally guilty in that they are both criminally liable.  (*Bryant*, at p. 433; *Daveggio*, at p. 846.)  But the "equally guilty" language could be misleading if they might be guilty of different crimes and the jurors interpret it to preclude such a finding.  (*Bryant*, at p. 433; *Daveggio*, at p. 846.)

An aider and abettor may be criminally liable for acts not his or her own.  However, the aider and abettor's guilt may be "based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)  "'[O]nce it is proved that "the principal has caused an actus reus, the liability of each of the secondary parties should be assessed according to his [or her] own mens rea.'" (*Id*. at p. 1118.)  If the aider and abettor's mental state is more culpable than the direct perpetrator's, his or her guilt may be greater.  (*Id*. at p. 1117.)  "[A]n aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164.)

Cerda and Johnson rely on two cases to argue that the "equally guilty" language in CALCRIM No. 400 lessened the prosecution's burden of proof by not requiring that each defendant's culpability be determined independently.

First, in *People v. Samaniego*, the two defendants went to kill the victims, but no eyewitnesses saw the actual shooting. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1162.)  Thus, no

50

evidence established which defendant was the direct perpetrator. The reviewing court concluded that the language in CALCRIM No. 400 was misleading as applied to the unique circumstances presented by the facts. (*Id.* at p. 1165.) It noted that the "equally guilty" language in CALCRIM No. 400 is "generally correct in all but the most exceptional circumstances." (*Ibid.*)

The evidence here did not suggest Cerda and Johnson might have different states of mind and therefore might be guilty of different crimes. (*People v. Johnson*, *supra*, 62 Cal.4th at p. 640.) As discussed earlier, the evidence overwhelmingly showed that both Cerda and Johnson went to each location to kill. This case joined the group of cases where the "equally guilty" language would not be incorrect.

Second, in *People v. Nero* (2010) 181 Cal.App.4th 504 (*Nero*), the theory against the aider and abettor was that she handed a knife to the defendant, who used it to kill the victim. The jury expressly asked the trial court if an aider and abettor's guilt could be less than the perpetrator's guilt. The trial court did not respond in the affirmative, as it should have. Instead, it simply reread the instruction which included the "equally guilty" language.[41] (*Nero*, *supra*, 181 Cal.App.4th at p. 518.) The jurors confirmed the instruction answered their question. On the next day, the jury found both defendants guilty of second degree murder. The reviewing court concluded that the trial court improperly instructed the jury with the "equally guilty" language. (*Ibid.*)

---

[41] The trial court in *Nero* read CALJIC No. 3.00, which is the equivalent of CALCRIM No. 400. (*Nero*, *supra*, 181 Cal.App.4th at p. 512.) It also contained the "equally guilty" language.

Johnson argues that questions from the jury implied it was asking whether an aider and abettor could be guilty of a lesser offense than the perpetrator, as did the jury in *Nero*.[42] We disagree. These jury questions did not expressly ask if an aider and abettor had to be found guilty of the same degree of attempted murder as the direct perpetrator. Three of the questions expressly related to the murder charge, on which Johnson was convicted of the lesser degree. The remaining question asked if aider and abettor liability was available for attempted murder. None of these questions asked about the requisite mental states of the aider and abettor, or whether the aider and abettor could be more or less culpable than the direct perpetrator. Nor do they suggest the jury was confused by "equally guilty" language.

Accordingly, we conclude the trial court did not err by instructing with the "equally guilty" language in CALCRIM No. 400.

B. No prejudice

Assuming error, CALCRIM No. 401 resolved any potential confusion. CALCRIM No. 401 required proof that the aider and

---

[42] The first question asked: "Would it be the same charge, murder one, if Kyle Johnson shot the gun or did not but was in the car, because we are confused on the law. First degree or second." The second question asked if the jurors could ignore the fourth element of implied malice, i.e. deliberately acting with conscious disregard for human life. The third question read: "By agreeing to an aid or aider [*sic*] charge which would result in guilt, would the implied or express malice be considered." A fourth note read: "Can we use the aider and abettor theory of liability to find the defendant guilty of attempted murder?"

abettor must (1) *know* of the perpetrator's unlawful purpose, (2) *intend* to facilitate or assist that unlawful purpose, and (3) *act* in some manner that does assist or facilitate the unlawful purpose. Notwithstanding the "equally guilty" language of CALCRIM No. 400, this instruction advised that aider and abettor liability must be predicated on the state of mind of the aider and abettor, and the extent to which he knew of and intended to facilitate the purpose contemplated by the perpetrator. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 625.) CALCRIM No. 401 thus clarified that culpability was not based on the mental state of the direct perpetrator alone. "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 822.)

Accordingly, if the trial court omitted the "equally guilty" language from CALCRIM No. 400, we are convinced beyond a reasonable doubt the jury verdicts would have been the same. (*Samaniego, supra*, 172, Cal.App.4th at p. 1165; *Nero, supra*, 181 Cal.App.4th at pp. 518–519; *Chapman, supra*, 386 U.S. at p. 24.)

VI.    Shooting at an occupied house as a lesser offense

The natural and probable consequences theory was based on the target offense of shooting at an occupied house, in violation of section 246. Cerda contends all the convictions predicated on the natural and probable consequences doctrine must be reversed because the trial court failed to give the jury an opportunity to convict on shooting at an occupied house as a lesser included offense.

Shooting at an occupied house is not a necessarily included offense of murder or attempted murder. At most, it was merely a

53

lesser related offense. Cerda acknowledges that a trial court has no sua sponte duty to instruct on lesser related offenses. (*People v. Birks* (1998) 19 Cal.4th 108, 136.)

However, Cerda invites us to fashion a new rule. He correctly explains that when the prosecutor specifies a target crime under the natural and probable consequences theory and the trial court instructs on its elements, the jury is required to determine whether it has been committed to reach a conviction for the nontarget crime. Cerda appears to assert that the target offense is the "functional equivalent" of an element of the pleaded crime. He goes one step too far by proposing that as the functional equivalent of an element of the pleaded crime, the target crime becomes a lesser included offense of the nontarget crime. Cerda claims that as a lesser included offense, the jury should have been permitted to reach a separate verdict on it. But we decline to create such a new rule.

Even if the trial court had instructed jurors that they could convict Cerda and Johnson of shooting at an occupied house, as a lesser offense, it is not reasonably probable they would have acquitted them of murder and attempted murder. (*People v. Rogers* (2006) 39 Cal.4th 826, 867–868; *People v. Watson* (1956) 46 Cal.2d 818, 836–837.) In their roles as aiders and abettors, Cerda and Johnson each satisfied the required act, knowledge, and intent for aiding and abetting murder and attempted murder.

As discussed earlier, Cerda planned the Katrina Place shooting to retaliate against the 18th Street gang members who committed the earlier beating. He encouraged Johnson to join in the retaliation. Cerda retrieved the AK-47 assault rifle and wall-piercing ammunition from his home for Johnson to use.

54

As to the Morning Circle shooting, Johnson reversed roles with Cerda. He handed the AK-47 to Cerda. He relinquished his shooting position in the truck's bed to Cerda. Johnson's intent to kill was magnified by committing these acts soon after having committed the murder and attempted murders at the Katrina Place house with the same AK-47. Moreover, Johnson's defense at trial was not that he merely intended to shoot at a building, but that he was not even present at either shooting that night. The jury discredited his alibi defense.

Accordingly, we conclude there is no reasonable probability the juries would have convicted Cerda or Johnson of only violating the crime of shooting at an occupied house, if given the opportunity.

VII.   Ineffective assistance of counsel claims

A.  Failure to request voluntary intoxication instruction

Johnson contends he was denied effective assistance of counsel because his defense counsel failed to request a jury instruction on voluntary intoxication. We disagree.

A criminal defendant has the right to assistance of counsel under both the state and federal constitutions. (U.S. Const., 6th Am.; Cal. Const., art. I, §15; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.) The two-prong test for ineffective assistance of counsel is well settled. The defendant must show that (1) counsel's performance was deficient and (2) he or she suffered prejudice as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688; *People v. Mickel* (2016) 2 Cal.5th 181, 198.)

Johnson argues defense counsel should have requested a voluntary intoxication instruction based on his trial testimony. To support his argument, Johnson points to his testimony that he ingested methamphetamine before arriving at Jorge's party and

drank 10 to 15 beers and smoked marijuana after arriving. He further testified that he was intoxicated by the time he went over to the Katrina Place party.

But as the Attorney General points out, the evidence of Johnson's intoxication was not strong. Johnson's statement to the detectives contradicted his trial testimony. During the interview, Johnson indicated he consumed only two to four beers. He also failed to mention that he ingested methamphetamine. Johnson conceded he was not really drunk to the point of being unable to comprehend what happened.

We further reject Johnson's assertion that there was no tactical reason to forgo requesting the intoxication instruction. At trial, Johnson claimed to have an alibi. Specifically, he testified that he went home after being assaulted at the Katrina Place party and remained there for the rest of the night. Defense counsel could well have reasoned Johnson's testimony made any resort to an intoxication defense impractical because it would have undercut his alibi defense. (*People v. Olivas* (2016) 248 Cal.App.4th 758, 772.)

Johnson's defense counsel did not fall "'below an objective standard of reasonableness … under prevailing professional norms.'" (*People v. Lopez* (2008) 42 Cal.4th 960, 966; *People v. Mickel, supra*, 2 Cal.5th at p. 198.) Accordingly, his failure to request the intoxication instruction did not amount to ineffective assistance of counsel.

B. Failure to object to gang expert testimony

Cerda contends he was denied effective assistance of counsel because of the failure to object to the gang expert's testimony about a so-called "hard card," which indicated he was a gang member. Because the entries on the card had not been

56

made by the testifying expert himself, Cerda contends their admission violated both California hearsay law and the federal confrontation clause as established by *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

### 1. Additional facts

Detective Gillis explained how deputies collect information on suspected gang members during the daily course of their work. Deputies routinely fill out field identification cards, or "F.I." cards, to track their contacts with suspected gang members. This information includes the date and location of the contact, the person's name, birth date, address, description, tattoos, driver's license number, gang name, and associates. Gillis noted that an F.I. card is not always completed for every contact with a person. A "hard card" contains a photograph of the person and a compilation of information from F.I. cards.

Gillis personally spoke to Cerda in the past. But he could not recall if Cerda had ever admitted to him that he was an LMS gang member. Gillis testified he reviewed Cerda's hard card and an F.I. card completed by a deputy named Fender. According to the hard card, Cerda was affiliated with the LMS gang. The hard card also indicated that Cerda admitted membership in March or August of 2008. Gillis opined that Cerda was an LMS member based on his "consistent association" with LMS members in an area which they were trying to claim as their turf.

### 2. Confrontation clause

Under *Crawford*, admission of testimonial hearsay against a criminal defendant violates the Sixth Amendment right to confrontation, unless the declarant is unavailable to testify and the defendant had a previous opportunity to cross-examine him or her. (*Crawford*, *supra*, 541 U.S. at pp. 53–54.) Confrontation

clause jurisprudence, especially regarding expert testimony, has evolved since Cerda's trial in February and March of 2011. (See *People v. Blessett* (2018) 22 Cal.App.5th 903, 931–933 [discussing the development in confrontation clause analysis].) Our Supreme Court in *People v. Sanchez* has since considered the extent to which *Crawford* limits an expert witness from relating case-specific hearsay in forming an opinion. (*People v. Sanchez* (2015) 63 Cal.4th 665, 670–671 (*Sanchez*).) "*Sanchez* 'jettisoned' the former 'not-admitted-for-its-truth' rationale underlying the admission of expert basis testimony, and occasioned a 'paradigm shift' in the law." (*People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1246.)

We need not discuss the intricacies of the *Crawford* evolution. At the time of trial in 2011, an objection to Gillis's testimony about the notations on Cerda's hard card would have been routinely and properly overruled by the trial court. At the time, the well-established rule in California was that reliable hearsay evidence was admissible under Evidence Code sections 801 and 802 for the non-hearsay purpose of revealing the basis for an expert witness's opinion and, in that context, such evidence was not admitted for its truth. (See *People v. Gardeley* (1996) 14 Cal.4th 605*,* 618, disapproved by *Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. 13 [expert testimony may be premised on material not admitted into evidence if "it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions" and the expert "can, when testifying, describe the material that forms the basis of the opinion"].)

We cannot see how Cerda's defense counsel could have been reasonably expected to anticipate the subsequent change in law wrought by *Sanchez*. Defense counsel cannot be faulted "when

the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change." (*People v. Turner* (1990) 50 Cal.3d 668, 703.)  At the time of Cerda's trial, it was not reasonably foreseeable that caselaw would conclude the hearsay upon which the gang expert relied was offered for its truth, and the admission of such hearsay violated the confrontation clause.  Accordingly, we conclude Cerda has failed to show that defense counsel's performance was deficient.

VIII.  No cumulative error

Johnson contends the cumulative prejudicial effect of the various trial errors he has raised on appeal requires the reversal of his conviction.  Because we have found no errors for Johnson, his claim of cumulative error fails.  (*People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

IX.  Claims of sentencing error

A.  Cerda's sentences on the attempted murder counts

The Attorney General asserts that the trial court erred by not imposing sentences of 35 years to life on each of the attempted premeditated murder convictions arising out of the Katrina Place shooting (counts 2 through 14).  Based on the Attorney General's calculation, each sentence would consist of a life term for attempted premeditated murder (§ 664), enhanced by a 15-year minimum parole eligibility term for the gang penalty provision (§ 186.22, subd. (b)(5)), plus an additional 20-year enhancement for a principal discharging a firearm (§ 12022.53, subd. (c), (e)).

We disagree.  For counts 2 through 14, the trial court correctly imposed the seven-year minimum parole eligibility period under section 3046, subdivision (a)(1), and did not increase

it to 15 years for the gang penalty provision.  Because Cerda did not personally use or discharge a firearm at the Katrina Place shooting, section 12022.53, subdivision (e)(2) prohibits the imposition of both the vicarious firearm enhancement and the gang penalty provision.  (*People v. Brookfield* (2009) 47 Cal.4th 583, 595 (*Brookfield*); *People v. Gonzalez* (2010) 180 Cal.App.4th 1420, 1427 (*Gonzalez*).)  Only the punishment for the firearm enhancement could be imposed because it was the greater penalty.  (§ 12022.53, subd. (j).)

Cerda contends the trial court erred by imposing sentences of 35 years to life for the attempted premeditated murder convictions arising out of the Morning Circle shooting (counts 15 through 24).  He argues that the trial court should have stayed the minimum parole eligibility term of 15 years for the gang penalty provision because of the prohibition against imposing both the vicarious firearm enhancement and the gang penalty provision, pursuant to section 12022.53, subdivision (e)(2).  (*Brookfield*, supra, 47 Cal.4th at p. 595; *Gonzalez*, *supra*, 180 Cal.App.4th at p. 1427.)

We reject Cerda's argument because he was not vicariously liable for counts 15 through 24.  He personally discharged the firearm in the Morning Circle shooting.  Thus, the prohibition under section 12022.53, subdivision (e)(2) does not apply to these counts.

B. Probation report at sentencing

Cerda also argues that he must be resentenced because no probation report was prepared at the time of sentencing.  We reject this argument.  A probation report is not necessarily required if the defendant is statutorily ineligible for probation. (*People v. Dobbins* (2005) 127 Cal.App.4th 176, 180; *People v.*

*Murray* (2012) 203 Cal.App.4th 277, 289.) The firearm enhancement made Cerda ineligible for probation. (§ 12022.53, subd. (g).) Additionally, a probation report was subsequently prepared and filed. Because Cerda cites no mistakes in the report, he has failed to demonstrate any error.

X.     Limited remand in accordance with *Franklin*

Johnson was found guilty of second degree murder and 23 counts of attempted premeditated murder, for which the trial court imposed a sentence of 410 years to life. Johnson is entitled to have his case remanded to the trial court to create a record of information relevant to his eventual youth offender parole hearing. The Attorney General agrees.

Based on the Eighth Amendment's prohibition on cruel and unusual punishment, the United States Supreme Court has concluded the "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children."[43] (*Miller v. Alabama* (2012) 567 U.S. 460, 474.) The Court has expressed concern about sentencing juvenile offenders to prison terms that prevent any possibility of rehabilitation and eventual release. (*Roper v. Simmons* (2005) 543 U.S. 551, 569–570 [concluding juvenile offenders must be treated differently than adult offenders for sentencing because they have lessened culpability, lack maturity, and are more vulnerable to negative influences].) Accordingly, the Court has prohibited: (1) execution for an offense committed as a juvenile (*id*. at p. 578), (2) a life without the possibility of parole sentence for a nonhomicide offense committed by a juvenile (*Graham v. Florida* (2010) 560

---

[43]     The Eight Amendment applies to the states. (*Robinson v. California* (1962) 370 U.S. 660, 666–667.)

U.S. 48, 74), and (3) the automatic imposition of a life without the possibility of parole sentence for a homicide offense committed by a juvenile.  (*Miller*, at p. 474.)

Our Supreme Court has further considered these prohibitions.  First, *People v. Caballero* (2012) 55 Cal.4th 262, 268, concluded that sentencing a juvenile offender for a nonhomicide offense to a term which is the "functional equivalent of a life without parole sentence" constitutes cruel and unusual punishment.  Second, *Franklin*, *supra*, 63 Cal.4th at pages 275–276, prohibited the imposition of the functional equivalent of a life without the possibility of parole sentence on juvenile offenders for a homicide offense unless the sentencing authority retains individualized discretion to impose a less severe sentence and considers youth-related mitigating factors.

The Legislature also passed Senate Bill No. 260, which became effective January 1, 2014.  (Stats. 2013, ch. 312, §§ 1, 4, 5.)  Senate Bill No. 260 added section 3051 and 4801, subdivision (c).  As pertinent here, section 3051, subdivision (b)(3) provides a youth offender parole hearing to a person, who was under 25 years old at the time of his or her controlling offense and was sentenced to 25 years to life or greater. [44]  The hearing must occur

---

[44]    The juvenile offender's "controlling offense" is defined as "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment."  (§ 3051, subd. (a)(2)(B).)  The statute originally applied only to offenders under the age of 18 (Stats. 2013, ch. 312, § 4), but was amended to apply to offenders who were under the age of 23 when they committed the controlling offense.  (Stats. 2015, ch. 471, § 1; *People v. Costella* (2017) 11 Cal.App.5th 1, 8.)  Section 3051 was

during the 25th year of his or her sentence.  Section 4801, subdivision (c) was designed to ensure that eligible juvenile offenders have a meaningful opportunity for release no more than 25 years into their incarceration, upon consideration of the diminished culpability of juveniles, the hallmark features of youth, and any subsequent growth and increased maturity. (*Franklin*, *supra*, 63 Cal.4th at p. 277; *People v. Jones* (2017) 7 Cal.App.5th 787, 817.)

The Legislature intended youth offender parole hearings to apply retrospectively to all eligible youth offenders regardless of the date of conviction.  (*Franklin*, *supra*, 63 Cal.4th at p. 278.) Eligibility under section 3051, subdivision (b) is open to any person "convicted of a controlling offense that was committed before the person had attained 25 years of age."  Section 3051, subdivision (i) also states, "The board shall complete all youth offender parole hearings for individuals who become entitled to have their parole suitability considered at a youth offender parole hearing on the effective date of this section by July 1, 2015." Thus, the statutory text makes clear that the provisions apply to juvenile offenders already sentenced at the time of enactment.

*Franklin* concluded sections 3051 and 4801 contemplate that information of the juvenile offender's characteristics and the circumstances at the time of the offense would be relevant at the youth offender parole hearing to facilitate consideration by the Board of Parole Hearings.  (*Franklin*, *supra*, 63 Cal.4th at pp. 283–284.)  Section 3051, subdivision (f) permits the submission of psychological evaluations and risk assessments, as

---

amended again in 2017 to apply to persons 25 years of age or younger.  (Stats. 2017, ch. 684, § 1.5.)

63

well as statements by various persons with knowledge about the youth offender before the crime. Such a task would typically be "more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away." (*Id.* at pp. 283–284.)

Accordingly, a juvenile offender must be afforded an opportunity to make a record of the relevant information for his or her later youth offender parole hearing. (*Franklin, supra,* 63 Cal.5th at p. 284.) *Franklin* further directed trial courts to receive submissions and testimony, pursuant to the procedures in section 1204 and rule 4.437 of the California Rules of Court, subject to the rules of evidence. (*Ibid.*) The prosecutor may also introduce any evidence that demonstrates the offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors. (*Ibid.*)

Johnson was 16 years old at the time of the shootings. On August 26, 2011, he was sentenced to a term greater than 25 years to life. He did not have any opportunity to present evidence relevant to his future youth offender parole hearing. We believe the proper course is to remand to the trial court to follow the procedures outlined in *Franklin* to ensure Johnson is afforded the opportunity to develop the record. (*People v. Jones, supra,* 7 Cal.App.5th at pp. 819–820; *People v. Scott* (2016) 3 Cal.App.5th 1265, 1283; *People v. Perez* (2016) 3 Cal.App.5th 612, 619.)

XI.    Remand in light of SB 620

Cerda and Johnson request that we remand for resentencing to allow the trial court to exercise its discretion to strike the firearm enhancements, in light of SB 620.

64

Effective January 1, 2018, the Legislature amended section 12022.53 by adding subdivision (h), which allows a court to exercise its discretion under section 1385 to strike or dismiss the personal use of a firearm enhancement at the time of sentencing. (Sen. Bill No. 620 (2017–2018 Reg. Sess.), Stats. 2017, ch. 682, § 1, p. 5104; *People v. Billingsley* (2018) 22 Cal.App.5th 1076, 1080; *People v. Robbins* (2018) 19 Cal.App.5th 660, 678.) The amendment to section 12022.53 applies to cases that were not final when it became operative. (*People v. Watts* (2018) 22 Cal.App.5th 102, 119; *People v. Arredondo* (2018) 21 Cal.App.5th 493, 507; *Estrada, supra*, 63 Cal.2d at p. 745.)

""Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion."' (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)" (*People v. Chavez* (2018) 22 Cal.App.5th 663, 713.)

For both Cerda and Johnson, the record does not clearly indicate whether the trial court would have imposed the firearm enhancements had it possessed the discretion to strike them. Out of an abundance of caution, we remand for resentencing.[45]

---

[45] We decline to follow Cerda's suggestion to direct the trial court to appoint new counsel because he claims ineffective assistance by his prior counsel in a petition for writ of habeas

We express no opinion about how the trial court should exercise its discretion on remand.**]]**

---

corpus currently before the California Supreme Court.  Upon remand, Cerda can move to discharge his appointed counsel based on ineffective assistance and request to have new counsel appointed for his resentencing.  (*People v. Marsden* (1970) 2 Cal.3d 118, 123.)

## DISPOSITION

Cerda's first degree murder conviction is reversed. We remand the matter for the district attorney to decide whether to accept a reduction of this conviction to second degree murder or retry Cerda for first degree murder under theories other than the natural and probable consequences doctrine.

The sentences for both Cerda and Johnson are vacated. We remand for resentencing to allow the trial court to exercise its discretion and determine whether to strike the firearm enhancements under section 12022.53. The trial court is also to afford Johnson an opportunity to make a record of information for the Board of Parole Hearings to fulfill its obligations under sections 3051 and 4801, as required by *Franklin, supra*, 63 Cal.5th at pages 286–287. The judgments of conviction are otherwise affirmed as to both Cerda and Johnson.

CERTIFIED FOR PARTIAL PUBLICATION.

HANASONO, J.*

We concur:

EDMON, P. J.          EGERTON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.